UNITED STATES of America, Plaintiff,

v.

George Lyman WILSON, John Robert Stambaugh, Michael M. Skott, James A. Ketchum, Robert C. Braun, and Daniel J. Balint, Defendants.

No. 94–CR–140.

United States District Court,
E.D. Wisconsin.

March 16, 1995.

---

Mel S. Johnson, Asst. U.S. Atty., Milwaukee, WI, for plaintiff.

Robert J. Penegor, Penegor Law Office, Brookfield, WI, for defendant George Lyman Wilson.

Rene L. Wright, Rutherford Institute, Charlottesville, VA, for defendant John Robert Stambaugh.

Michael Skott, South Milwaukee, WI, John J. Broderick, Broderick Law Office, Syosset, NY, for defendant Michael Skott & Stand–By Counsel.

Alexander Flynn, Flynn & Associates, Milwaukee, WI, for defendant James A. Ketchum.

Robert Braun, West Allis, WI, Nancy M. Barasch, Malinsky & Barasch, Kenosha, WI, for defendant Robert Braun and Stand–By Counsel.

William R. Kerner, Brusky, Kerner & Mares, Wauwatosa, WI, for defendant Daniel J. Balint.

### DECISION AND ORDER

RANDA, District Judge.

This case is about Congress' authority under the Constitution to pass the Freedom of Access to Clinics Entrances Act, codified at 18 U.S.C. § 248, *et seq.* ("FACE"). More specifically, as charged in the Information, this case is about that portion of FACE which prohibits the non-violent physical obstruction of entrances to reproductive health services clinics.[1] Because the regulation of this type of conduct through the use of the Commerce Clause power is unprecedented and would permit Congress to exceed the scope of its enumerated power, thereby upsetting the delicate federal balance embodied in the Tenth Amendment and elsewhere in the Constitution, and further because private action is unreachable under Section 5 of the Fourteenth Amendment, that portion of FACE is unconstitutional and void.[2]

### ANALYSIS

"It is, emphatically, the province and duty of the judicial department, to say what the law is." *Marbury v. Madison,* 5 U.S. 137, 177, 1 Cranch 137, 2 L.Ed. 60 (1803). Indeed, "[t]his is of the very essence of judicial duty." *Id.* at 178; *see also, Bell v. Maryland,* 378 U.S. 226, 244, 84 S.Ct. 1814, 1824, 12 L.Ed.2d 822 (1964) (Douglas, J., concurring). Therefore, though not written into the

Constitution, the power of judicial review has become a bedrock principle of our jurisprudence. In exercising this power, the Court must be mindful that "[t]he powers of the legislature are defined and limited; and that those limits may not be mistaken or forgotten, the constitution is written." *Marbury,* 5 U.S. at 176.[3]

### I. THE STATUTE

The pertinent part of FACE reads as follows:

§ 248. Freedom of access to clinic entrances

(a) Prohibited activities.—Whoever—

(1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services; ... shall be subject to the penalties provided in subsection (b) and the civil remedies provided in subsection (c), except that a parent or legal guardian of a minor shall not be subject to any penalties or civil remedies under this section for such activities insofar as they are directed exclusively at the minor.

(b) Penalties.—Whoever violates this section shall—

(1) in the case of a first offense, be fined in accordance with this title, or imprisoned not more than one year, or both; ... except *that for an offense involving exclusively a non-violent physical obstruction* the fine shall be not more than $10,000 and the length of imprisonment

---

1. The Information alleges that defendants "by non-violent physical obstruction intentionally ... [intimidated and interfered] ... with persons because they were obtaining reproduction health services and with persons because they were providing reproductive health services."

2. The remaining portions of FACE are not before the Court and are preserved by the severability

provision of the Act. Pub.L. 103–259, sec. 5 (May 26, 1994).

3. "Limitations of this kind can be preserved in practice no other way than through the medium of the courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void." *The Federalist No. 78* (A. Hamilton).

shall be not more than six months or both, for the first offense. . . .

18 U.S.C. § 248 (emphasis supplied).

Through application of this statute the Government seeks to prosecute, and thereby regulate, a private activity wholly intrastate in character, non-violent by description and definition[4], without any commercial aspect, the control of which has historically and traditionally rested within the domain of local and state authorities, and which has no direct affect on interstate commerce but instead affects an activity found by Congress to be within "the stream of interstate commerce."

## II. COMMERCE CLAUSE

### A. *Scope of Commerce Power.*

■ The scope of Congress' power under the Commerce Clause is set forth in *Hodel v. Virginia Surface Mining & Reclamation Asso.*, 452 U.S. 264, 276–277, 101 S.Ct. 2352, 2360–2361, 69 L.Ed.2d 1 (1981):

This power is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution. *Gibbons v. Ogden*, 9 Wheat. 1, 196 [6 L.Ed. 23] (1824). Moreover, this Court has made clear that the commerce power extends not only to "the use of channels of interstate or foreign commerce" and to "protection of the instrumentalities of interstate commerce . . . or persons or things in commerce," but also to "activities affecting commerce." *Perez v. United States*, 402 U.S. 146, 150 [91 S.Ct. 1357, 1359, 28 L.Ed.2d 686] (1971). As we explained in *Fry v. U.S.*, 421 U.S. 542, 547 [95 S.Ct. 1792, 1795, 44 L.Ed.2d 363] (1975), "[e]ven activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States or with foreign nations." *See Wickard v. Filburn*, 317 U.S. 111, 127–128 [63 S.Ct. 82, 90–91, 87 L.Ed. 122] (1942), and

*U.S. v. Darby*, 312 U.S. 100, 120–121 [61 S.Ct. 451, 460–461, 85 L.Ed. 609] (1941).

When reviewing Congress' exercise of power under the Commerce Clause, courts apply a "rational basis" test:

The task of a court that is asked to determine whether a particular exercise of congressional power is valid under the Commerce Clause is relatively narrow. The court must defer to a congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding. * * * Thus, when Congress has determined that an activity affects interstate commerce, the courts need inquire only whether the finding is rational.

*Hodel* at 276–77, 101 S.Ct. at 2360 (citations omitted). Thus, "[j]udicial review in this area is influenced above all by the fact that the Commerce Clause is a grant of plenary authority to Congress." *Id.*

■ The quick conclusion is that the foregoing defines an unlimited power, one that is unlimited both in its jurisdictional reach and in Congress' authority to set the limits of that reach. Indeed, because the Commerce power is extensive, and because the Supreme Court has rarely struck down legislation under the rational basis test, the continued expansion of that power has made it difficult for lower courts to perceive any articulable limits. However, the constant refrain in most, if not all, of the cases reviewing each new exercise of the Commerce power is that there are not only limits, but constitutionally required limits dictated by the federalist structure embodied in the Constitution:

Undoubtedly, the scope of this power must be considered in the light of our dual system of government and may not be extended so as to embrace effects on interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and

---

**4.** It may be argued that while the conduct engaged in is non-violent, its character changes when the conduct is used to intimidate persons as charged in the Information. However, as defined by the statute itself, intimidation requires

a "reasonable apprehension of bodily harm." 18 U.S.C. § 248(d)(3). Therefore, non-violent conduct is by definition not "intimidation" under the Act and is not transformed by the purported reason ·for its use.

what is local and create a completely centralized government.

*N.L.R.B. v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937). In light of this federalist structure, the Commerce power is not and cannot be unlimited because it is only one of several defined and enumerated powers. When an exercise of that power threatens to "obliterate the distinction between what is national and what is local," it is the duty of the Court to articulate and apply constitutional limits upon that power:

> ... [i]t would be a mistake to conclude that Congress' power to regulate pursuant to the Commerce Clause is unlimited. *Some activities may be so private or local in nature that they simply may not be in commerce.* Nor is it sufficient that the person or activity reached have some nexus with interstate commerce. Our cases have consistently held that the regulated activity must have a *substantial effect* on interstate commerce. Moreover, simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so. Congress' findings must be supported by a "rational basis" and are reviewable by the courts.

*Hodel,* 452 U.S. at 310–311, 101 S.Ct. at 2391 (Rehnquist, J., concurring) (citations omitted) (emphasis supplied).

Thus, while Congress' power is *plenary,* this does not mean that Congress possesses the authority to reach beyond the boundaries the Constitution establishes. The power is plenary only within its sphere. For when Justice Marshall explained that the power of Congress to regulate commerce "acknowledges no limitations," he excepted those limitations that were "prescribed in the constitu-

tion." *Gibbons v. Ogden,* 22 U.S. 1, 196, 9 Wheat. 1, 6 L.Ed. 23 (1824). And what is prescribed in the Constitution, that which still characterizes our form of government, and that which is implicated most in Congress' exercise of the Commerce power, is the federalist structure.[5]

### B. *Rational Basis Test.*

As previously stated, "[t]he Court must defer to a Congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding." *Hodel, supra.* But "rational" in what sense? On one hand, it cannot mean the Court will defer to Congress only if it acts upon the "most rational" basis available to it. Federal courts do not sit as final arbiters on the wisdom of public policy. Indeed, the wisdom of a specific public policy is rarely the concern of a federal court and is certainly not the concern of the Court in this case. On the other hand, the Court does not defer to the Congress simply because it has acted rationally in a purely "logical" sense. For there may always be a plausible rationale for Congressional action that meets the requirements of simple logic. If this alone was the test there would be no activity which Congress could not regulate under its Commerce power. That is, in a logical sense, *all* activity "affects" commerce because "there is no private activity, no matter how local and insignificant, the ripple affect from which is not in some theoretical measure ultimately felt beyond the borders of the state in which it took place...." *United States v. Lopez,* 2 F.3d 1342, 1362 (5th Cir.1993), *cert. granted,* —— U.S. ——, 114 S.Ct. 1536, 128 L.Ed.2d 189 (1994). Indeed, in a *strictly* logical sense, all activity affects commerce because virtually all activity requires commerce and all commerce requires activity.[6] A rationale rooted

---

5. "... [T]hroughout the Court's history [the Commerce Clause has] been the chief source of its adjudications regarding federalism." Felix Frankfurter, *The Commerce Clause* pp. 66–67 (1937). ·

6. *See also* Justice Cardozo's comment in *A.L.A. Schechter Poultry Corporation v. United States,* 295 U.S. 495, 554, 55 S.Ct. 837, 853, 79 L.Ed. 1570 (1935) (citation omitted) wherein he observed "[t]here is a view of causation that would obliterate the distinction between what is nation-

al and what is local in the activities of commerce. Motion at the outer rim is communicated perceptibly, though minutely, to recording instruments at the center. A society such as ours is an elastic medium which transmits all tremors throughout its territory; the only question is of their size * * * The law is not indifferent to considerations of degree. Activities local in their immediacy do not become interstate and national because of distant repercussions. To find immediacy or directness here is to find it almost everywhere. If centripetal forces are to be iso-

in such logic would provide a basis for Congress to regulate social and cultural institutions such as our schools, churches and families because they play a critical role in the formation of human beings whose relative abilities will determine the quality and quantity of our national commerce.[7]

■ The "rational basis" test, therefore, must mean more. In order for Congress to justify its regulation of purely local, non-violent, non-commercial activity, there must be a connection between the activity and interstate commerce that is "rational" both as a matter of simple logic *and within the context of the Constitution and the structural limitations created therein.* The necessary first principle is that Congress' power under the Commerce Clause is not self-creating. Rather, the power to regulate interstate commerce is created by and within a federal constitution which in turn places limits upon the exercise of the powers it created. The limits on the Commerce power are twofold. The first limit applies to both Congress and the States. That is, neither may regulate commerce in a manner or fashion which prohibits the free exercise of religion, or abridges the right of assembly, or violates any other provision of the Constitution. *See Hodel,* 452 U.S. at 312–13, 101 S.Ct. at 2392–2393 (Rehnquist, J., concurring). The second applies only to Congress. Congress cannot regulate activity that does not have a substantial effect upon interstate commerce. The latter is simply another way of stating that Congress can not regulate activity in a manner which exceeds the limited and enumerated powers granted to it under our federal Constitution. This limitation dictates that those powers which are not expressly given to Congress by the Constitution are prohibited to it. The existence and vitality of

this principle is not disputed, is consistently reiterated by the Courts, and is implicit in the delegation of powers contained in Art. 1, Sec. 8. Indeed, if the framers intended to give Congress the power to operate in all spheres, it would have been unnecessary to list some of those spheres in the Constitutional text. Moreover, to remove any doubts as to the intentions of the framers in this regard, the principle was included within the Bill of Rights and expressly added to the Constitution via the Tenth Amendment, which states that "[t]he powers not delegated to the United States by the Constitution nor prohibited by it to the States, are reserved to the States respectively or to the people."

■ From the foregoing, it is clear that Congress cannot interpret and exercise any one of its enumerated powers so expansively that it effectively subsumes other enumerated powers or those powers reserved to the States, or extends to *all* spheres of human activity. It necessarily follows that if the logic underlying the stated connection to interstate commerce would provide a basis for regulating any human activity, that logic is not rational within the context of the Constitution. Sustaining any legislation based upon such logic results in abdication of the Court's power of judicial review and places in Congress a power limited only by the inclination and creativity of its members.

With this understanding of the rational basis test, the Court analyzes FACE within the framework of existing precedent and with reference to the findings made by Congress.

### C. *The Precedent.*[8]

■ "The Commerce Clause reaches, in the main, three categories of problems."

---

lated to the exclusion of the forces that oppose and counteract them, there will be an end to our federal system."

7. If it appears that the Court is entering a world of irrelevant abstraction, one need only cite and quote Congress' post-enactment findings in support of The Gun–Free School Zones Act, 18 U.S.C. § 922(q). For example, in § 922(q)(1)(F) and (G), Congress "found" that "the occurrence of violent crime in school zones has resulted in a decline in the quality of education in our country" and that "this decline in the quality of edu-

cation has an adverse impact on interstate commerce and the foreign commerce of the United States."

8. While every reported District Court, and now the Fourth Circuit Court of Appeals, have upheld FACE as a permissible exercise of Congress' power under the Commerce Clause, the extent of review undertaken by these Courts goes no further than concluding that Congress acted rationally in a purely logical sense. *American Life League, Inc. v. United States,* 855 F.Supp. 137 (E.D.Va.1994), aff'd 47 F.3d 642 (4th Cir.1995);

*Perez v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 1359, 28 L.Ed.2d 686 (1971). In *Perez,* Justice Douglas termed the first category the "misuse" of the channels of commerce. Regulation within this category is justified on the grounds that the subject matter has traveled in interstate commerce. This includes, *inter alia,* stolen goods, 18 U.S.C. § 2314, *et seq.;* kidnapped persons, 18 U.S.C. § 1201, *et seq.;* prostitutes, 18 U.S.C. § 2421, *et seq.;* drugs, 21 U.S.C. 841(a), *et seq.*[9]; and guns, 18 U.S.C. § 922, *et seq.* The second category involves the protection of the instrumentalities of interstate commerce. As an example of a category two offense, Justice Douglas cited 18 U.S.C. § 32 which prohibits the destruction of an aircraft. The third category encompasses "those activities affecting commerce." *Perez* at 150, 91 S.Ct. at 1359.

In Congress' attempt to justify FACE within Commerce Clause precedent, or an acceptable extension thereof, it crafted a patchwork rationale drawn from all three categories of precedent. However, it is clear that FACE must reside, if at all, within category three. Cases and legislation falling within category three include, *inter alia, Gibbons, supra, Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964), *Perez, supra, Russell v. United States,* 471 U.S. 858, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985), and *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). As perceived by this Court, this authority demonstrates that the Supreme Court has upheld the regulation of three distinct types of activ-

ity as "affecting commerce": (1) trivial activity which undermines a national commercial regulatory scheme; (2) commercial activity that affects interstate travel; and (3) activity that employs violent means to achieve an economic purpose.

**1. National commercial regulatory scheme.**

*Wickard* concerned the conduct of one farmer who had produced excess wheat for his own consumption in contravention of the Agricultural Adjustment Act of 1938. The Court upheld the regulation of such "trivial" conduct because, in the aggregate, it undermined a national *commercial* regulatory scheme. The Supreme Court found that because Congress had established, and had authority to establish, a national scheme to "control the volume [of wheat] moving in interstate and foreign commerce in order to avoid surpluses and shortages ...," the farmer's conduct, when "taken together with that of others similarly situated, [was] far from trivial." *Wickard* at 115, 128, 63 S.Ct. at 84, 90, citing *National Labor Relations Board v. Fainblatt,* 306 U.S. 601, 606, 59 S.Ct. 668, 671–72, 83 L.Ed. 1014 (1939). Thus, *Wickard* stands only for the proposition that "[w]here the class of activities is regulated *and that class is within the reach of federal power,* the courts have no power to excise, as trivial, individual instances of the class." *Perez,* 402 U.S. at 154, 91 S.Ct. at 1361. (citations omitted) (emphasis supplied). That *Wickard* goes no further than this was confirmed in *Maryland v. Wirtz,* 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968):

*Council For Life Coalition v. Reno,* 856 F.Supp. 1422 (S.D.Cal.1994); *Cook v. Reno,* 859 F.Supp. 1008 (W.D.La.1994); *Riely v. Reno,* 860 F.Supp. 693 (D.Ariz.1994). But as discussed *supra,* if judicial review in Commerce Clause cases means anything, and the Supreme Court keeps repeating that it does, the rational basis test must mean something more exacting than the application of simple logic.

9. While it is clear that drugs, unlike guns, need not be shown to have traveled in interstate commerce, *United States v. Esposito,* 492 F.2d 6 (7th Cir.1973), *cert. denied,* 414 U.S. 1135, 94 S.Ct.

879, 38 L.Ed.2d 760 (1974), citing, *United States v. Scales,* 464 F.2d 371 (6th Cir.1972), this can be explained by the Congressional finding that "it was impossible to distinguish between substances manufactured and distributed intrastate from those manufactured and distributed interstate" and thus "control of the intrastate incidents of traffic in controlled substances was essential to the control of interstate incidents of that traffic." *United States v. Lopez,* 459 F.2d 949, 952–53 (5th Cir.), *cert. denied, Llerena v. United States,* 409 U.S. 878, 93 S.Ct. 130, 34 L.Ed.2d 131 (1972).

Neither here nor in *Wickard* has the Court declared that Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities. The Court has said only that where a *general regulatory statute bears a substantial relation to commerce,* the de minimis character of individual instances arising under that statute is of no consequence.

*Id.* at 197, n. 27, 88 S.Ct. at 2024 n. 27 (emphasis supplied). Here, there is simply no national commercial regulatory scheme established by Congress which allows the federal power to extend to the trivial acts of non-violent physical obstruction. Indeed, the statute's regulatory focus is on the trivial acts themselves.[10]

In *Perez, supra,* the Supreme Court reviewed Congress' authority to reach "extortionate credit transactions" under Title II of the Consumer Credit Protection Act, 18 U.S.C. § 891, *et seq.* In finding Title II a valid exercise of the Commerce Clause power, the Court relied primarily on *Wickard.* Justice Douglas cited extensive Congressional findings that "loan sharking was the second largest source of revenue for organized crime and is one way by which the underworld obtains control of legitimate businesses" *Perez,* 402 U.S. at 155, 91 S.Ct. at 1362 (internal quotation omitted). In effect then, extortionate credit transactions were "commercial" in that they replaced legitimate commercial enterprises including "securities brokerages and banks which are then exploited.... *Id.* at 156, 91 S.Ct. at 1362.[11] Moreover, extortionate credit transactions were found to directly "impair the effectiveness and frustrate the purposes of the laws enacted by the Congress on the subject of bankruptcies." *See,* Pub.L. 90–321, sec. 201(a)(4). Therefore, consistent with *Wickard,* intrastate extortionate activity, even if trivial, was reachable under the Commerce Clause because the aggregate effect thereof affected a national commercial regulatory scheme that Congress had the authority to establish in the first instance. By contrast, the aggregate effect of non-violent physical obstruction of reproductive health services clinics does not undermine any particular commercial or financial scheme that Congress has enacted. Again, Congress seeks instead to regulate the trivial activity itself.

## 2. Commercial activity affecting interstate travel.

In enacting FACE, Congress relied primarily on the rationale used to enact civil rights legislation. *See, e.g., Heart of Atlanta Motel, supra* and *Katzenbach v. McClung, supra.* These cases are plainly distinguishable. First, Title II of the Civil Rights Act of 1964 regulated the conduct of commercial entities because they received goods which moved in interstate commerce. Unlike Title II, FACE does not regulate commercial entities, but rather regulates private conduct affecting commercial entities which in turn receive goods that have traveled in interstate commerce. *Heart of Atlanta* and *Katzenbach* might provide precedent for regulating the clinics themselves, but they do not provide precedent for regulating private conduct affecting those clinics. If Congress had required clinics to undertake a variety of security precautions such as the provision of escorts, compliance with specific building codes, etc., it might be able to cite these cases as relevant precedent. Instead, Congress chose to regulate conduct one step removed from the commercial enterprise.

Second, the Supreme Court upheld Congress' exercise of power under the Commerce Clause based on extensive findings that discrimination in restaurants and motels "had a direct and highly restrictive effect upon interstate travel" of African–Americans. *Katzenbach,* 379 U.S. at 299, 85 S.Ct. at

---

10. The Court here uses the phrase "trivial activity" as a term of art developed by the *Wickard* line of cases. It is not meant to comment one way or the other upon the qualitative nature of the conduct proscribed in FACE.

11. The Organized Crime Control Act arguably falls within category one. *See,* Pub.L. 90–321, sec. 201(a)(3) (This type of activity is "carried on to a substantial extent in interstate and foreign commerce and through the means and instrumentalities of such commerce.")

381.[12] While the Supreme Court upheld the regulation of restaurants and motels under Title II, the Commerce power was not exercised to ensure the right to eat and sleep, but rather, the right to travel interstate.[13] In other words, the discriminatory conduct was subject to regulation because it deprived African–Americans of the necessities to travel interstate, *i.e.*, food and shelter. By contrast, the rationale advanced in support of FACE is that women seeking abortions will be forced to travel interstate because of obstructionist conduct in their own states. Plainly, the provision of reproductive health services, unlike food and shelter, is not a necessity of interstate travel. Therefore, because FACE does not regulate commercial activity that affects the right to travel interstate, the civil rights cases do not provide the necessary precedential support.

### 3. Violent means to achieve an economic purpose.

The third type of activity falling within category three are those activities that employ violent means to achieve an economic purpose. An example of this type of activity is found in *Russell, supra,* where the Supreme Court upheld Title XI of the Organized Crime Control Act of 1970, 18 U.S.C. § 844, *et seq.*, as a valid exercise of Congress' power under the Commerce Clause. The violent means employed in *Russell* was the attempt to create a natural gas explosion to commit arson. The economic purpose was to obtain insurance proceeds from the destruction of a rental property.[14] Similarly, in *Stirone v. United States, supra,* the Supreme Court upheld the Hobbs Act, which regulates robbery and extortion. Both robbery and extortion are violent in nature. Moreover, as defined in the Act, it is clear that robbery and extortion involve more than "interference" with commerce or a commercial enterprise. Instead, they seek to "dispossess" or obtain the personal property of another. Thus, as in *Russell,* the activity at issue involves the use of violent means to achieve an economic purpose. In contrast, the non-violent physical obstruction of reproductive health services clinics does not employ violent means to achieve an economic purpose; rather, it employs non-violent means to achieve a purely political or social purpose.[15]

**12.** In *Heart of Atlanta,* the Supreme Court found a Commerce Clause justification because the motel was readily accessible to interstate highways, actively solicited out of state business, and 75% of its registered guests were from out of state. *Id.,* 379 U.S. at 242–43, 85 S.Ct. at 350–51. In *Katzenbach,* the Supreme Court found the exercise to be valid because, within the terms of Title II, a substantial ($70,000) portion of the food served by the respondent moved in commerce. *Id.* 379 U.S. at 298–99, 85 S.Ct. at 381.

**13.** While there is no question that the "intent" of Congress was to combat racial discrimination, in order to accomplish that goal via the Commerce Clause, Congress had to hinge its exercise of power on the restrictive effect that discrimination had on interstate travel and the flow of goods through the channels of interstate commerce.

**14.** In upholding the petitioner's conviction and the regulation, Justice Stevens found that petitioner's activities fell within Congress' power "to regulate the class of activities that constitute the rental market for real estate." *Id.* 471 U.S. at 862, 105 S.Ct. at 2457, citing *Perez.* However, because Justice Stevens does not discuss this class of activities beyond merely identifying it, and because arson to rental property clearly uses violent means to achieve an economic purpose,

*Russell* is treated here as falling within that line of precedent.

**15.** Indeed, Congress has expressly limited the application of FACE to conduct having either a political or social, but clearly not economic, motive:

It should be emphasized, however, that section 2715(a) prohibits force, threat of force, or physical obstruction that intentionally injures, intimidates or interferes with someone only if the offender has acted with the requisite motive: i.e., only if the offender acts against the target "because" the target of the offender's conduct is or has been obtaining or providing abortion-related services[.] . . . By the same token, section 2715(a)(2) prohibits the intentional damage or destruction of property of a medical facility only if the offender has acted "because" the facility provides abortion-related services. Thus, for example, if an environmental group blocked passage to a hospital where abortions happen to be performed, but did so as part of a demonstration over harmful emissions produced by the facility, the demonstrators would not violate this Act (though their conduct might violate some other law, such as a local trespass law). In that example, the demonstrators' motive is related to the facility's emissions policy and practices and not to its policy and practices on abortion-

In conclusion, FACE is unprecedented among category three cases because it does not regulate trivial activity that undermines a national commercial regulatory scheme, commercial activity that affects the right to travel interstate, or activity that employs violent means to achieve an economic purpose. Having failed to locate FACE within precedent, the Government is left arguing that FACE is constitutionally valid simply because Congress' power under the Commerce Clause has continually expanded. Indeed, from the dramatic and sudden expansion during the "New Deal," through the civil rights cases, to the expanded regulation of criminal matters, the exercise of the Commerce power appears unchallengeable. It represents, in its array, a juggernaut of power. But in its expansion, the power also presents, paradoxically, its own constriction or constraint. For juggernauts of power are not only foreign to, but forbidden by, the federalist Constitution. This proscription grows even stronger as the power tends to distort the federalist structure. It is in the nature of the constitutional compact to suspect such concentrations and to halt their growth if they threaten the framework which gave them birth.

### D. *Congressional Findings.*

Having concluded that precedent does not compel a finding of constitutionality, the Court must examine the Congressional findings to determine whether or not they support an extension of the precedent to include this type of conduct. As previously discussed, while deference is owed Congressional findings, "simply because Congress may conclude that a particular activity substantially affects interstate commerce, does not necessarily make it so." *Hodel, supra.* Congress' findings must be supported by a "ra-

tional basis." Thus in applying the "rational basis" test to these findings, the Court considers the question it posed earlier: Does the logic of the Congressional findings made with respect to the non-violent physical obstruction of reproductive health services clinics provide a basis for federal regulation of any human activity? The answer is yes.

Congress made four basic findings that the conduct proscribed by FACE substantially affects interstate commerce. The Court addresses each separately. First, abortion clinics operate within the stream of interstate commerce because they purchase supplies, employ staff, own and lease office space and generate income.[16] Although one cannot argue with the logic of this conclusion, it is less a "finding" than it is a statement of the obvious. For all practical purposes, *all* persons and *all* entities operate within the stream of commerce. Most Americans purchase goods and own or lease real property and most either employ staff or are employed as staff. Most Americans generate income in some form or another. All Americans enter the stream of commerce through the purchase of goods, however minimal those purchases may be. Under this rationale, no one is immune from federal regulation under the Commerce power.

Second, Congress found that some individuals travel across state lines in order to provide or obtain abortions. This does not distinguish abortion from any other human activity. Ours is a nation comprised of 50 states, each with its own borders. Our citizenry is highly mobile and is dispersed throughout these 50 states, some residing near a state border and some not. By virtue of the former there will be, with respect to any human activity, some individuals who

---

related services. The Committee has concluded that inclusion of the motive element is important to ensure that the Act is precisely targeted at the conduct that, as the Committee's record demonstrates, requires new Federal legislation: deliberate efforts to interfere with the delivery of abortion—related services. * * * *This motive requirement is not simply a repetition of the scienter requirement ... Rather, another element of the offense must be proven: that the offender acted out of an abortion-related motive.*

S.Rep. 103–117, 103rd Cong., 1st Sess. (1993) (emphasis supplied).

**16.** As discussed in connection with the civil rights cases, FACE does not regulate abortion clinics, it regulates abortion protests. Therefore, the fact that such clinics operate within the stream of commerce does not provide a direct basis for regulating abortion protests. That fact may provide an indirect basis for regulating such protests and that issue is raised in connection with the third Congressional finding, discussed *infra.*

cross state lines to perform that activity. The percentages undoubtedly vary in relation to the activity and the borders at issue, but Congress did not rely upon a finding that abortion is uniquely interstate in this regard as compared to all other human activities. If some people cross state lines to go golfing, bowling, camping or shopping, can Congress regulate these activities? If 1,000 more people cross state lines to obtain abortions each year than do to go golfing, does that provide a rational basis for concluding that Congress may regulate trespass at reproductive health services clinics but not at golf courses? Of course not. The decision to regulate one and not the other would be based on nothing more than Congressional inclination, meaning there is little to gain or lose in the political fight to protect golf courses. The latter bespeaks a limit to Congressional action, but not to Congressional power. Thus, this finding also extends Congressional power to any sphere of human activity.

Third, Congress found that obstructing access to abortion clinics decreases the number of abortions performed in this country and therefore has a negative affect on interstate commerce. Does Congress now have the power under the Commerce Clause to regulate any human activity which arguably decreases the sale or purchase of specific goods or services? It would appear so. For if we accept these findings, we must conclude that Congress has the power to regulate any non-commercial intrastate activity that in turn negatively affects a commercial entity operating within the stream of commerce. The implications of such a power are immense and unprecedented.[17] The Supreme Court has long held that Congress may regulate wholly intrastate activity that substantially affects interstate commerce, but it has never said that Congress may regulate wholly intrastate, non-violent, non-commercial activity simply because it decreases the demand for particular goods or services.[18]

Last, Congress found that the problem addressed by FACE is nationwide in scope and beyond the ability of states to control. This in and of itself adds nothing to the force of Congress' findings. The problem at issue cannot simply be national in scope; it must also substantially affect interstate commerce. In this regard, one is reminded of Justice Stewart's dissent in *Perez*, stating that "[i]t is not enough to say that [the crime] ... is a national problem ... for ... interstate business suffers from almost all criminal activity be it shoplifting or violence in the streets." *Perez*, 402 U.S. at 157–58, 91 S.Ct. at 1363 (Stewart, J., dissenting). As to the inability of the states to control the problem, Congress found that "existing criminal laws at the state and local levels have failed to provide the certainty of prosecution, conviction and punishment necessary to deter these activities on a nationwide scale." S.Rep., 103–117, 103rd Cong., 1st Sess. (1993). Again, it is not enough that the states cannot control the problem; the problem must substantially affect interstate commerce. Moreover, given a rising crime rate, this finding could be applied to all criminal activities traditionally regulated by the states. While Congress' findings suggest that local law enforcement and local laws are insufficient, one would expect, before federal intervention occurs, that state and local authorities would first attempt to strengthen their respective laws and, failing in that, submit requests under 42 U.S.C. § 10501 for federal assistance:

> [I]t is important to note that ... federal statute offers the possibility of powerful federal assistance for persons who are in-

---

17. Under this standard, Congress could regulate shoplifting because it reduces the supply of goods. It could regulate the use of cabs or busses because it reduces the demand for cars. It could regulate dieting because it reduces the demand for certain types of food. It could regulate breast-feeding because it reduces the demand for formula. It could regulate video rentals because it reduces the demand for theaters. It could regulate the use of computers and computer software because it reduces the demand for typewriters, books, etc.

18. The Senate report cites *Heart of Atlanta Motel, supra* as precedent for such a conclusion. As discussed earlier, *Heart of Atlanta* actually reinforces the position taken here. While *Heart of Atlanta* allowed the regulation of wholly local activity on the premise that it had "a substantial and harmful effect upon ... commerce", the regulated local activity was commercial in nature, *i.e.*, "motels serving travelers." It requires another step to get to wholly local, non-commercial activity.

jured or threatened by organized lawless conduct that falls within the primary jurisdiction of the States and their local governments.

\* \* \* \* \* \*

Should state officials deem it necessary, law enforcement assistance is authorized upon request by the State to the Attorney General of the United States, pursuant to 42 U.S.C. Sec. 10501. In the event of a law enforcement emergency as to which State and local resources are inadequate to protect the lives and property of citizens or to enforce the criminal law, Sec. 10502(3), the Attorney General is empowered to put the full range of federal law enforcement resources at the disposal of the State, including the resources of the United States Marshals Service, which was presumably the principal practical advantage to respondents of seeking a federal injunction under Sec. 1985(3).

\* \* \* \* \* \*

... Indeed, the statute itself explicitly directs the Attorney General to consider the need to avoid unnecessary Federal involvement and intervention in matters primarily of State and local concern.

Bray v. Alexandria Women's Health Clinic, —— U.S. ——, ——, 113 S.Ct. 753, 769, 122 L.Ed.2d 34 (1993) (Kennedy, J., concurring) (citations omitted) (emphasis supplied). It would appear that this finding is significantly undercut when the legislative history contains no official plea for assistance from any state pursuant to the above section. This is particularly true in light of Congress' clearly stated policy in § 10501 to "avoid unnecessary Federal involvement and intervention in matters primarily of State and local concern."

Taken together, these findings demonstrate Congress' growing reliance upon rationales that reflect the abstract principle stated earlier: All activity "affects" commerce because virtually all activity requires commerce and all commerce requires activity. If this is the only rational basis required to sustain legislation under the Commerce Clause, Congress can regulate any human activity.[19] Such a standard is irrational within the context of the Constitution:

19. Some might argue that Congress *can* regulate any human activity *precisely because* virtually all activity requires commerce and all commerce requires activity. That is, Congress' power under the Commerce Clause has grown because the volume and nature of interstate commerce has grown to permeate all aspects of our lives. Justice O'Connor noted this development in *New York v. United States:*

The volume of interstate commerce and the range of commonly accepted objects of governmental regulation have, however, expanded considerably in the last 200 years, and the regulatory authority of Congress has expanded along with them. As interstate commerce has become ubiquitous, activities once considered purely local have come to have effects on the national economy, and have accordingly come within the scope of Congress' commerce power.

*New York v. United States,* 505 U.S. 144, ——–——, 112 S.Ct. 2408, 2418–19, 120 L.Ed.2d 120 (1992) (citations omitted). Accepting that the growth of our national economy played a role in the growth and breadth of Commerce Clause legislation (*cf.,* "There has been no basic transformation of the economy that requires, or allows, a parallel transformation in the scope of the commerce clause." Richard A. Epstein, *The Proper Scope of the Commerce Power,* 73 Va.L.R. 1387, 1397 (1987)), one hesitates to conclude that Commerce Clause legislation is solely Congress' response to changing economic conditions. Quite the contrary, much of the modern Commerce Clause legislation has been a response to changing social conditions or attitudes, examples being the child labor laws, civil rights laws, organized crime laws and others. While the "growth of the economy" rationale has more often than not provided only the authority for federal regulation, rather than its underlying motive, and while there is nothing per se unconstitutional in this practice, this case illustrates a growing and obvious tension between that practice and the concept of enumerated powers. That is, as it is more fully understood and accepted that all human activity has its economic attributes or consequences, Congress increasingly relies upon this abstract principle to offer boilerplate commercial rationales to regulate purely local activities for the purpose of achieving purely social objectives. Courts uphold these regulations because Congress has stated a rational (meaning logical) connection to interstate commerce, even though the connection is fairly remote and abstract. The inevitable result is an enumerated power subsuming all other powers, transforming the federal government into a government of undefined and unlimited powers, and thereby decreasing the constitutional role of the federal courts. Such a fundamental expansion of an enumerated power cannot be accomplished without amending the Constitution.

[T]he enumeration of the particular classes of commerce to which the power was to be extended, would not have been made, had the intention been to extend the power to every description. The enumeration presupposes something not enumerated[.]

*Gibbons, supra* at 194–95.

The powers of the legislature are defined and limited; and that those limits may not be mistaken or forgotten, the constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained?

*Marbury, supra,* 5 U.S. at 176–77.

### E. *Federalist Concerns.*[20]

 Finally, in deciding whether the limits of any enumerated power have been exceeded, the Court is directed to consider the Tenth Amendment and the principles of federalism embodied therein:

The Tenth Amendment likewise restrains the power of Congress.... [T]he *Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States. The Tenth Amendment thus directs us to determine, as in this case, whether an incident of state sovereignty is protected by a limitation on an Article 1 power.*

*New York, supra,* 505 U.S. at ——, 112 S.Ct. at 2417 (emphasis supplied). The Court's role in deciding the proper use of the Commerce power, therefore, necessarily includes analyzing how a particular exercise of that enumerated power relates to the Tenth Amendment and the incidents of state sovereignty that the Tenth Amendment protects. Through such an analysis, the "proper" or "healthy" balance of federalism is preserved. In conducting that analysis,

[I]t makes no difference whether one views the question at issue in this case as one of ascertaining the limits of the power delegated to the Federal Government under the affirmative provisions of the Constitution or one of discerning the core of sovereignty retained by the states under the Tenth Amendment.

*Id.* at ——, 112 S.Ct. at 2419.

The foregoing confirms that "the Tenth Amendment and the Commerce Clause issues ... are but two sides of the same coin." *Lopez, supra* at 1346. Regarding the Tenth Amendment side of the coin, "state sovereignty is not just an end in itself," *New York,* 505 U.S. at ——, 112 S.Ct. at 2431, but "[r]ather federalism secures to citizens the liberties that derive from the diffusion of sovereign power." *Coleman v. Thompson,* 501 U.S. 722, 759, 111 S.Ct. 2546, 2570, 115 L.Ed.2d 640 (1991) (Blackmun, J., dissenting). The protections secured by this diffusion of power and the "incidents" of state sovereignty are those "objects which in the ordinary course of affairs, concern the lives, liberties and properties of the people," "those personal interests and familiar concerns to which the sensibility of individuals is more immediately awake." *See respectively, The Federalist No. 45.* (J. Madison), *The Federalist No. 17,* (A. Hamilton).

Thus, while a Tenth Amendment analysis may be viewed as structural and can be distinguished from a "constitutional defense," such as one rooted in the "individual rights" found in the first eight amendments to the Constitution, it does not merely consider the interests of an "abstract political entity". *New York, infra.* The analysis is larger in its implications and more significant in its substance because the Tenth Amendment and its incidents of state sovereignty must be viewed in light of the "fundamental liberties" it protects.[21] It would appear, therefore, that the closer any regulation under the

---

20. "... [T]hroughout the Court's history [the Commerce Clause has] been the chief source of its adjudications regarding federalism." Felix Frankfurter, *The Commerce Clause* pp. 66–67 (1937).

21. "The Constitution does not protect the sovereignty of States for the benefit of the States or

state governments as abstract political entities, or even for the benefit of the public officials governing the States. To the contrary, the Constitution divides authority between federal and state governments for the protection of individuals." *New York,* 505 U.S. at ——, 112 S.Ct. at 2431.

Commerce power comes to an "object" which falls within the ordinary course of local affairs and touches the ordinary course of people's lives and properties, such as FACE's regulation of non-violent trespass, the stronger the confirmation by the Tenth Amendment that Congress has exceeded the scope of its enumerated power and is "subject to limits."

Applying these principles to the case at bar, it is without question that non-violent physical obstruction is closely analogous to simple trespass, which historically and traditionally has rested within the domain of state, and even local, authorities.[22] Indeed, in such situations, Congress itself acknowledges that Tenth Amendment concerns are of prime importance in deciding whether or not to intervene in matters of state and local concern. 42 U.S.C. § 10501, discussed, *supra.* Therefore, the Tenth Amendment analysis clearly confirms the Court's earlier conclusion that Congress has exceeded the scope of its Commerce power.

In conclusion, the tone of the Government's brief suggests that the distinctions drawn by the defendants, and relied upon by the Court, are small matters and mere quibbling in light of the undeniable juggernaut of Congressional power that has been unleashed under the Commerce Clause. However, "for want of a nail" large causes have been lost and it will not do therefore, to dismiss considerations of small things as small things or mere quibbling when they relate to the structure of the Constitution itself. The Court has struggled to define an articulable limit to the reach of the rationale underlying FACE's proscription of non-violent physical obstruction. However, the Court has been unable to articulate any limit that would uphold the constitutionality of this portion of FACE while preserving the federalist principles embodied in the Constitution's enumeration of powers. This case represents a point at which the bedrock constitutional principle of enumerated powers is strained beyond meaning and recognition and a point at which the delicate balance and distinction between the powers of the Federal Government and the powers of the States is irretrievably lost. To permit this exercise of the Commerce power requires the Court to listen to the voice of power over that of authority, thereby reaching a point where judicial deference becomes judicial abdication. This the Court cannot do. Accordingly, the Court finds unconstitutional that portion of 18 U.S.C. § 248(a)(1) which applies to non-violent physical obstruction of reproductive health services clinics.

## III. THE FOURTEENTH AMENDMENT

■ Having concluded that this portion of FACE exceeds the scope of Congress' Commerce power, the Court now considers whether FACE may be sustained under Section 5 of the Fourteenth Amendment.[23] The Fourteenth Amendment, by its terms, applies only to state conduct. In support of Congress' authority to proscribe purely private conduct, the Government cites, *inter alia, United States v. Guest,* 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966), *Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), *District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973), *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), and *Planned Parenthood v. Casey,* —— U.S. ——, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). While former Justices Brennan and Clark have, at various times,

---

**22.** By way of contrast, in passing the Organized Crime Control Act of 1970, Congress found that "approximately 35 States have little or no regulation over the sale and distribution of dynamite and other explosive substances." H.R.Rep. 1549, 91 Cong., 2d Sess. (1972).

**23.** Section 1 of the Fourteenth Amendment provides:

All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Section 5 provides:

The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

made statements that the Fourteenth Amendment might be used to reach private conduct, the Supreme Court has never so held. Indeed, such a holding would render superfluous the entire line of Supreme Court jurisprudence examining when private conduct is sufficiently intertwined with state authority so as to fall within the Fourteenth Amendment. *See, e.g., Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 173, 92 S.Ct. 1965, 1971–72, 32 L.Ed.2d 627 (1972) ("[W]here the impetus for the discrimination is private, the State must have 'significantly involved itself with invidious discriminations,' in order for the discriminatory action to fall within the ambit of the constitutional prohibition.") (citations omitted); *accord, Sherman v. Community Consol. Sch. Dist. 21,* 8 F.3d 1160, 1167 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2109, 128 L.Ed.2d 669 (1994) ("The Equal Protection Clause of the Fourteenth Amendment is violated only if there is 'state action.'").

Furthermore, if Supreme Court precedent supported the Government's position, Congress' reliance upon the Commerce Clause in support of civil rights legislation, and now in support of FACE, would have been unnecessary. Indeed, invocation of the Commerce Clause was (and still is) necessary precisely because the Fourteenth Amendment has never been held to reach private conduct. For example, in *Heart of Atlanta,* the majority relied on the Commerce Clause and implicitly rejected Justice Douglas' preference to uphold Title II on Fourteenth Amendment grounds. *Id.* 379 U.S. at 281, 85 S.Ct. at 370, citing his concurrence in *Bell v. Maryland, supra.*

In support of its authority to enact FACE pursuant to Section 5, Congress relied upon various unsupported conclusions and dictum from *Katzenbach v. Morgan, Guest,* and *Carter. Katzenbach v. Morgan* is cited for the principle that Congress' power to enforce Section 1 of the Fourteenth Amendment is broader than that of the courts. As a reaffirmation of that principle, the Government also cites Justice O'Connor's recent statement in *J.A. Croson, supra* that "[t]he power to 'enforce' [the provisions of the Fourteenth Amendment] may at times also include the power to define situations which Congress determines threaten principles of equality and to adopt prophylactic rules to deal with those situations." *J.A. Croson,* 488 U.S. at 490, 109 S.Ct. at 720. The above language speaks only to the breadth of Congress' power within its authority under Section 5, it says nothing about whether private conduct is proscribable under the Fourteenth Amendment. To hold that Congress' powers are broader than those of the courts is plainly distinct from holding that Congress' authority extends to the regulation of merely private conduct under the Fourteenth Amendment. Indeed, any doubt about whether Justice O'Connor believes that private conduct is proscribable under the Fourteenth Amendment has been laid to rest by her statement in *Bray, supra,* —— U.S. at —— – ——, 113 S.Ct. at 803–804 (1993), citing *Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948) ("The Fourteenth Amendment protects against state action, but it 'erects no shield against merely private conduct, however discriminatory or wrongful.'") (O'Connor, J., dissenting).

*Guest* is cited by the Government for the proposition that Congress possessed the power under the Fourteenth Amendment "to enact laws punishing all conspiracies ... whether or not state officers or others acting under the color of state law are implicated in the conspiracy." *Guest,* 383 U.S. at 782, 86 S.Ct. at 1191 (Brennan, J., concurring-in-part and dissenting-in-part); *Id.* at 762, 86 S.Ct. at 1180 (Clark, J., concurring). While what could loosely be termed a "majority" expressed such a view, the matter is only one of academic interest since the opinion of the Court stated the exact opposite:

> The Fourteenth Amendment protects the individual against state action, not against wrongs done by individuals. This has been the view of the Court from the beginning. It remains the Court's view today.

*Id.* at 755, 86 S.Ct. at 1176 (citations omitted). Finally, the Government relies on dictum found in a footnote in *Carter,* 409 U.S. at 424, n. 8, 93 S.Ct. at 606 n. 8, suggesting that private conduct is reachable under the Fourteenth Amendment. The Supreme Court, however, has consistently held over a long

line of cases that the Fourteenth Amendment "erects no shield" against private conduct.

In conclusion, the views expressed in *Katzenbach v. Morgan, Guest* and *Carter* are insufficient to overcome the weight of over 100 years of Fourteenth Amendment jurisprudence which holds that Congress has no power to reach merely private conduct under the Fourteenth Amendment. Accordingly, FACE is not a valid exercise of Congress' power under Section 5 of the Fourteenth Amendment.

## IV. THE PROTECTION OF FUNDAMENTAL RIGHTS

 Finally, the Government argues that FACE is a valid exercise of Congress' inherent power to pass laws that protect the exercise of fundamental rights, including the right to an abortion recognized by the Supreme Court in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The Government cites no authority for this novel proposition. Moreover, Congress did not cite such a power in its findings as an independent basis for the constitutionality of the statute.[24] The Court is simply not aware of a single case standing for the proposition that Congress can regulate any activity that arguably affects the exercise of a fundamental right secured by the Constitution. Rather, Congressional regulation must always fall within an express delegation of power contained in the Constitution, such as the enumerated powers contained in Article 1, Section 8 or the enforcement powers contained in the 13th, 14th and 15th Amendments. To hold otherwise would render the enforcement provisions of the latter amendments superfluous and nullify the concept of enumerated powers. It further highlights Congress' inability to place this exercise of Congressional

power within any precedential authority or reasonable extension thereof.[25]

**NOW THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. That portion of 18 U.S.C. § 248(a)(1) which proscribes the non-violent physical obstruction of reproductive health services clinics is unconstitutional; and

2. The Information is **DISMISSED** as to all defendants.

**SO ORDERED.**

---

24. The Senate report does analogize FACE to those civil rights laws which prohibit the use of force or threats of force to interfere with those seeking to exercise a fundamental right, such as the right to vote. S.Rep. 103–117, 103rd Cong., 1st Sess. (1993). The Attorney General testified that this analogy provided a powerful justification for the enactment of FACE. *Id.* However, Congress' constitutional authority to pass the civil rights laws at issue was never upheld on the grounds that these laws protected the exercise of fundamental rights. Rather, authority was always drawn from one of the enumerated powers,

such as the Commerce Clause, or from the enforcement provisions contained in the 13th, 14th or 15th Amendments.

25. The Court declines to address the defendants' First Amendment challenge in light of the Court's conclusion that FACE is not a valid exercise of Congress' power under either the Commerce Clause or the Fourteenth Amendment. Moreover, the First Amendment issue is pending before the Seventh Circuit.