UNITED STATES of America, Plaintiff,

v.

Jeffrey Lee WHITE, et al., Defendants.

No. CV 95–2760 RAP (GHKx).

United States District Court,
C.D. California.

June 23, 1995.

James Rainboldt, Rainboldt & McIntyre, Cypress, CA, Michael Hirsh, Ross Heckman, Ross Steven Heckman Law Offices, Glendale, CA, for defendants.

Pamela L. Johnston, Asst. U.S. Atty., Los Angeles, CA, Robert J. Moossy, Dept. of Justice, Washington, DC, Mellie Nelson, U.S. Atty. Gen., Special Litigation Section, Civil Rights Div., Washington, DC, for plaintiff.

## MEMORANDUM RE PRELIMINARY INJUNCTION AND ORDER DENYING MOTIONS TO DISMISS

PAEZ, District Judge.

Plaintiff United States of America moved this Court for a preliminary injunction pursu-

ant to the Freedom of Access to Clinic Entrances Act of 1994 ("FACE"), 18 U.S.C. § 248, Fed.R.Civ.P. 65, and Local Rule 7.17. The United States requested that the Court enjoin defendants Jeffrey White, Joseph Foreman, Bryan Kemper, their agents, servants, employees, and all individuals acting in concert with them from, among other things, using force or threats of force to interfere with or intimidate Dr. Michael Morris or his wife, Sarah Morris, in violation of the FACE statute.

Defendants opposed the motion based on Congress' lack of authority to enact FACE under the Commerce Clause of the Constitution and Section 5 of the Fourteenth Amendment, as well as on First Amendment grounds. Defendants also moved to dismiss the complaint for failure to name as indispensable parties Attorney General Janet Reno and Dr. Michael Morris. In addition, defendants moved to dismiss for failure to state a claim on the same Commerce Clause and Fourteenth Amendment grounds set forth in their opposition to the motion for a preliminary injunction, as well as on the purported absence of allegations in the complaint that would justify injunctive relief.

On June 15, 1995, the Court heard and denied defendants' three motions to dismiss. The Court also heard oral testimony on the preliminary injunction.

On June 19, 1995, the Court heard oral argument on the motion for a preliminary injunction. The Court considered fully the moving, opposition, and reply papers, the authorities cited therein, the declarations, exhibits, and oral arguments of counsel, as well as the witnesses' credibility. As stated at the conclusion of the hearing, the United States demonstrated it is substantially likely to prevail on the merits and that the balance of hardships tips in its favor. The Court thus issued the preliminary injunction on June 19, 1995, setting forth findings of fact and conclusions of law orally which are amplified herein. In addition, the Court formally denies defendants' three motions to dismiss, denied previously at the hearing on June 15, 1995.

## I.

### INTRODUCTION

On April 26, 1995, plaintiff United States of America filed a Civil Complaint for Injunctive Relief against defendants Jeffrey Lee White, Joseph Foreman, Bryan Scott Kemper (together, "the individual defendants"), Operation Rescue of California, and John Doe I, alleging violation of the Freedom of Access to Clinic Entrances Act of 1994, 18 U.S.C. § 248. The U.S. filed a motion for preliminary injunction on the same date.

On May 22, 1995, Operation Rescue and the individual defendants each filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(7) on the grounds that Attorney General Janet Reno is an indispensable party and the only proper party authorized to bring this action. The individual defendants then filed a motion to dismiss under Fed.R.Civ.P. 12(b)(6) challenging the constitutionality of FACE on June 2, 1995. They also moved for joinder of a party (Dr. Morris) pursuant to Fed. R.Civ.P. 12(b)(7) and 19(a) the same date. On June 5, 1995, Operation Rescue filed a notice of joinder in the individual defendants' motions, although it subsequently withdrew its motion regarding the Attorney General.

## II

### THE FREEDOM OF ACCESS TO CLINIC ENTRANCES ACT OF 1994

Congress stated the purpose of the Freedom of Access to Clinic Entrances Act as follows:

> Pursuant to the affirmative power of Congress to enact this legislation under section 8 of article I of the Constitution, as well as under section 5 of the fourteenth amendment to the Constitution, it is the purpose of this Act [enacting this section and provisions set out as notes under this section] to protect and promote the public safety and health and activities affecting interstate commerce by establishing Federal criminal penalties and civil remedies for certain violent, threatening, obstructive and destructive conduct that is intended to injure, intimidate or interfere with persons seek-

ing to obtain or provide reproductive health services.

Pub.L. 103–259, § 2. Although the conference committee deleted the findings from the Senate Bill, instead incorporating a portion of them in the above Purpose section, the "Conferees note[d] that Congress has found:

(1) An interstate campaign of violent, threatening, obstructive and destructive conduct aimed at providers of reproductive health services across the nation has injured providers of such services and their patients, and the extent and interstate nature of this conduct place it beyond the ability of any single state or local jurisdiction to control;

(2) Such conduct, which has included blockades and invasions of medical facilities, arson and other destruction of property, assaults, death threats, attempted murder and murder, infringes upon the exercise of rights secured by federal and state law, both statutory and constitutional;

(3) Such conduct also burdens interstate commerce by forcing patients to travel from states where their access to reproductive health services is obstructed to other states, and by interfering with the interstate commercial activities of health care providers, including the purchase and lease of facilities and equipment, sale of goods and services, employment of personnel and generation of income, and purchase of medicine, medical supplies, surgical instruments and other supplies from other states;

(4) Prior to the Supreme Court's decision in *Bray v. Alexandria Women's Health Clinic,* [— U.S. —] 113 S.Ct. 753 [122 L.Ed.2d 34] (1993), the conduct described in paragraphs (1) through (3) above was frequently enjoined by federal courts in actions brought under 42 U.S.C. 1985(3), but in that case the Court denied a remedy under such section to persons injured by the obstruction of access to abortion-related services; and

(5) Violent, threatening, obstructive and destructive conduct aimed at providers of reproductive health services can be prohibited, and the right of injured parties to seek redress in the courts can be established, without abridging the exercise of any rights guaranteed under the First Amendment to the Constitution or under any other law."

H.R.Conf.Rep. No. 103–488, 103d Cong., 2d Sess. 1994, 1994 WL 168882 (May 2, 1994), p. 5, U.S.Code Cong & Admin.News 1994, pp. 699, 724. The Senate Report from the Committee on Labor and Human Resources described the need for the legislation:

From 1977 to April 1993, more than 1,000 acts of violence against abortion providers were reported in the United States. These acts included at least 36 bombings, 81 arsons, 131 death threats, 84 assaults, two kidnappings, 327 clinic invasions, and one murder. In addition, over 6,000 clinic blockades and other disruptions have been reported since 1977. The record before the Committee establishes that state and local law enforcement is inadequate to handle this situation, and that Federal legislation is urgently needed.

Sen.Rep. 103–117, 103d Cong., 1st Sess. (July 29, 1993), p. 3. The Report recounted information and testimony regarding the increasing severity of anti-abortion activities, including the murder of Dr. David Gunn. The Operation Rescue coordinator in the Washington, D.C. area even testified that killing someone involved in the delivery of abortion services would be appropriate. *Id.,* p. 4. The Senate Report also reviewed the attacks on facilities and destruction of property since 1977, resulting not only in risks to people's lives but "sharply curtail[ing] access to health care for many women, particularly women living in rural areas." *Id.* As clinics often provide general health services as well as those related to pregnancy, these attacks impact a considerably larger group. The Report added:

Anti-abortion extremists have recently added to their arsenal the introduction of noxious chemicals into clinic facilities in an effort to render them unusable. Since January, 1992, 71 chemical attacks have been reported in at least 15 states, causing at least $500,000 in damage. One chemical used with increasing frequency is butyric acid, which creates an intolerable stench and causes nausea, vomiting, headaches,

dizziness, inflamed eyes and skin, and difficulty in breathing. Butyric acid has been poured through holes drilled in clinic walls, sprayed through locks and under doors, and left in bathrooms by people entering the facilities posing as patients.

*Id.*, p. 6. Clinics are not the only locus for the attacks:

Dr. Pablo Rodriguez, Medical Director of Planned Parenthood of Rhode Island, testified that he discovered over 40 nails in his tires after his car began steering poorly on the highway. Subsequently, he said, his wife [ ] 'painfully discovered with her foot that [the] driveway was "boobytrapped" with roofing nails cleverly buried under the snow.' ... Anti-abortion activists have also blocked the driveways of staff and physicians with cement-filled barrels.

*Id.*, p. 7. The Report also cited the many death threats that abortion providers have received. *Id.*, pp. 10–11.

The increasing violence surrounding clinics is nationwide in focus, the Report documented. "Many of the activities ... have been organized and directed across State lines." *Id.*, pp. 13–14. Moreover, the adverse effects include harm to patients and providers. The Report further emphasized that existing laws are inadequate to redress these problems. Some jurisdictions have refused to respond at all to clinic violence and blockades. Even those that have responded have found it difficult if not impossible to reach across state lines to prosecute the individuals or groups responsible for planning the actions. *Id.*, pp. 17–21.

Congress thus provided in FACE for criminal and civil penalties, as follows:

**(a) Prohibited activities.—Whoever—**

(1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services;

(2) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship; or

(3) intentionally damages or destroys the property of a facility, or attempts to do so, because such facility provides reproductive health services, or intentionally damages or destroys the property of a place of religious worship,

shall be subject to the penalties ... and the civil remedies ...[.]

The "rules of construction" in subsection (d) further provide that "[n]othing in this section shall be construed—(1) to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment to the Constitution[.]" Congress defined FACE's key terms in subsection (e), notably, " '[i]nterfere with' means to restrict a person's freedom of movement[;]" " '[i]ntimidate' means to place a person in reasonable apprehension of bodily harm to him- or herself or to another[;]" and " '[p]hysical obstruction' means rendering impassable ingress to or egress from a facility that provides reproductive health services or to or from a place of religious worship, or rendering passage to or from such a facility or place of religious worship unreasonably difficult or hazardous."

To establish a violation of FACE, "the following elements must be proven[:]

1. Force, threat of force, or physical obstruction;

2. Done with the intent to;

3. Injure, intimidate, or interfere with a person, or attempt to do so;

4. Because that person has sought or provided, or is seeking or providing, or will seek or provide, reproductive health services."

*United States v. Lindgren*, 883 F.Supp. 1321, 1324–25 (D.N.D.1995). The court in *Lindgren* explained that it would first require the government to show a substantial probability of proving the four elements before considering the public interest and the balance of

potential injury to the parties "to determine whether a preliminary injunction should be issued." *Id., citing Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109 (8th Cir.1981).

## III

## MOTIONS TO DISMISS

### A

### Standards

#### 1. Motion to Dismiss for Failure to State a Claim

The purpose of a Rule 12(b)(6) motion is to test the "legal sufficiency of the claim or claims stated in the complaint." Schwarzer, Tashima and Wagstaffe, *California Practice Guide: Federal Civil Procedure Before Trial* ("*Fed.Civ.Proc.*"), § 9:187 (1994), *citing Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *De La Cruz v. Tormey,* 582 F.2d 45 (9th Cir.1978). The motion is disfavored; "dismissal is proper only in 'extraordinary' cases." *Fed.Civ.Proc.,* § 9:210, *citing United States v. Redwood City,* 640 F.2d 963 (9th Cir.1981).

▪ In evaluating the motion, the Court looks only to the face of the complaint to determine whether there are defects. *Levine v. Diamanthuset, Inc.,* 950 F.2d 1478, 1483 (9th Cir.1991); *see also Fed.Civ.Proc.,* § 9:211. The complaint is construed in the light most favorable to the plaintiff. *Russell v. Landrieu,* 621 F.2d 1037, 1039 (9th Cir. 1980); *Fed.Civ.Proc.,* § 9:213. In addition, "the court must accept as true all material allegations in the complaint, as well as *reasonable inferences* to be drawn from them." *Fed.Civ.Proc.,* § 9:215 (emphasis in original), *citing NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986). In short, the "test is whether the facts, as alleged, support *any* valid claim entitling the plaintiff to relief," regardless of whether plaintiff erroneously used the wrong legal theory. *Fed.Civ. Proc.,* § 9:227 (emphasis in original); *Haddock v. Board of Dental Examiners of California,* 777 F.2d 462, 464 (9th Cir.1985).

#### 2. Motion to Dismiss for Failure to Join an Indispensable Party

▪ Rule 12(b)(7) enables a defendant "to challenge ... the complaint's failure to join 'persons whose presence is needed for a just adjudication' under FRCP 19." *Fed.Civ. Proc.,* § 9:158. The motion will only be granted where the party is "indispensable" (not merely "necessary") *and* the party cannot be joined. *Id.,* § 9:159, *citing Shermoen v. United States,* 982 F.2d 1312, 1317 (9th Cir.1992). To determine whether a party is indispensable, courts consider whether a valid reason exists for joining the absent party, whether joinder is feasible, and whether it is fair to proceed if the party cannot be joined. "[T]he matter is determined by the court after balancing the interests involved[.]" *Fed.Civ.Proc.,* § 7:104.

### B

### Discussion

#### 1. Motion to Dismiss for Failure to Join Janet Reno

▪ Defendants moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(7) based on plaintiff's failure to sue in the name of Attorney General Janet Reno rather than the United States of America. As defendants argue that the Attorney General is the "real party in interest," it appears that they should have made their challenge under Fed.R.Civ.P. 12(b)(6) based on Rule 17. *See generally Fed.Civ.Proc.,* §§ 7:2–7:27.2 and cases cited therein. In any event, they lack authority for their position that the Attorney General cannot sue in the name of the United States.

The Freedom of Access to Clinic Entrances Act of 1994 states in relevant part that "[i]f the Attorney General of the United States has reasonable cause to believe that any person or group of persons ... may be injured by conduct constituting a violation of this section, the Attorney General may commence a civil action in any appropriate United States District Court." 18 U.S.C. § 248(c)(2)(A). The statute does not require the Attorney General to sue in her own name.

Indeed, "the Attorney General has been held entitled to sue in the name of the United

States, with no special statutory authorization, to relieve the burdens upon commerce caused by racial segregation in interstate travel facilities ... or other forms of racially motivated interference.... Similarly, the Attorney General may sue, without a statute that says so, to enjoin unlawful actions obstructing navigable waters, ... and to enjoin improper changes in collective agreements where the changes would create a 'threat of obstructing interstate commerce[.]' " *United States v. Brand Jewelers, Inc.,* 318 F.Supp. 1293, 1297 (S.D.N.Y.1970) (citations omitted); *see also United States v. San Jacinto Tin Co.,* 125 U.S. 273, 284–85, 8 S.Ct. 850, 856–57, 31 L.Ed. 747 (1888) ("it cannot be denied that there exists in the Attorney General, as the head of the Department of Justice, the right to institute, in the name of the United States, a suit....")

And the statute on which Congress modeled FACE, the Fair Housing Act ("FHA"), 42 U.S.C. § 3601, *et seq.,* authorizes the Attorney General to sue without expressly authorizing suit in the name of the United States. The Attorney General in numerous FHA cases sued in the name of the United States without objection. *See e.g., United States v. City of Hayward,* 36 F.3d 832 (9th Cir.1994); *United States v. Presidio Investments, Ltd.,* 4 F.3d 805 (9th Cir.1993). It is thus well-established that the Attorney General, as the official charged with directing "litigation in which the United States, an agency, or officer thereof is a party, or has interests," 28 U.S.C. § 516, does not need special authorization to bring suit in the name of the United States. Defendants' motion to dismiss for failure to join or name Janet Reno is hereby denied.

### 2. *Motion to Dismiss for Failure to Join Dr. Morris*

█ Defendants have also moved to compel the joinder of Dr. Michael Morris as an involuntary plaintiff, asserting that he is an indispensable party. FACE authorizes "[a]ny person aggrieved" as well as the Attorney General and state attorneys general to commence a civil action for violations of its provisions. Nothing in the statute requires that any individual claim (or claimant) be brought together with one that an attorney general initiates. Defendants cite no authority for this proposition.

Turning again to the FHA for guidance, in *United States v. Hayward,* 805 F.Supp. 810 (N.D.Cal.1992), *rev'd on other grounds,* 36 F.3d 832 (9th Cir.1994), defendant argued that the United States should have joined the tenants, an arbitrator, and Alameda County as necessary and indispensable parties in an action for violations of a rent control ordinance. The court found that although the FHA (like FACE) established a private right of action and authorized the Attorney General to enforce the Act, it could grant complete relief without the other parties.

In the instant action, the United States requests only injunctive relief. Dr. Morris can, if he so desires, bring a separate action for damages without subjecting defendants to the risk of duplicate recovery for the same injuries. Defendants' motion lacks merit and is hereby denied.

### 3. *Motion to Dismiss for Failure to State a Claim*

█ Defendants have moved to dismiss the complaint for failure to state a claim, contending that Congress lacked authority under the Commerce Clause and Section 5 of the Fourteenth Amendment to enact FACE and that the complaint failed to allege facts demonstrating any need for injunctive relief. As the legal issues regarding Congress' authority are identical to those raised in opposition to the motion for preliminary injunction, they are discussed in that context rather than here.

As for the purported insufficiency of the allegations of plaintiff's complaint for injunctive relief, defendants have confused pleading with proof. Rule 8(a) of the Federal Rules requires "a short plain statement of the claim showing that the pleader is entitled to relief." The United States has pled defendants' violations of FACE, achieving the proper balance between specificity and brevity. Furthermore, plaintiff clearly identified the statutory authority for the relief it seeks and alleged in the prayer that unless restrained, defendants would continue engaging in the conduct and practices it set forth in the body of the

complaint. Plaintiff also alleged defendants' prior response(s) to police and court orders, thereby pleading further facts that would support the Government's claim that an injunction is necessary here. Plaintiff plainly met its pleading obligation, and the Court denies the motion to dismiss accordingly.

## IV

### MOTION FOR PRELIMINARY INJUNCTION

#### A

##### Standard

▪ To obtain the equitable remedy of an injunction, whether preliminary or permanent, the moving party must establish irreparable injury and inadequate legal remedies. *Stanley v. University of Southern California,* 13 F.3d 1313, 1320 (9th Cir.1994). Where a statute expressly provides for injunctive relief, though, the party need not establish irreparable injury or inadequate legal remedies. *Trailer Train Co. v. State Board of Equalization,* 697 F.2d 860, 868–69 (9th Cir.1983); *Fed.Civ.Proc.,* § 13:40. "In statute enforcement actions by the government, 'irreparable injury' is generally *presumed* where a statutory violation is clearly shown[.]" *Fed.Civ.Proc.,* § 13:58.10, *citing United States v. Nutri–Cology, Inc.,* 982 F.2d 394, 398 (9th Cir.1992) (the "passage of the statute itself is an implied finding by Congress that violations will harm the public."). *See also United States v. Odessa Union Warehouse Co-op.,* 833 F.2d 172, 175 (9th Cir.1987).

As for the moving party's likely success on the merits, plaintiff need not "show positively that [it] will prevail … A reasonable probability of success, not an overwhelming likelihood, is all that need be shown for preliminary injunctive relief." *Gilder v. PGA Tour, Inc.,* 936 F.2d 417, 422 (9th Cir.1991); *cf., United States v. Odessa Union Warehouse Co-op.,* 833 F.2d 172, 176 (9th Cir.1987) ("Because irreparable injury must be presumed in a statutory enforcement action, the district court needed only to find some chance of probable success on the merits.")

The court must also balance the parties' interests. "The critical element in determining the test to be applied is the relative hardship to the parties. If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *State of Alaska v. Native Village of Venetie,* 856 F.2d 1384, 1389 (9th Cir.1988) (internal citations omitted). The "public interest is an important consideration in the exercise of equitable discretion in the enforcement of statutes." *United States v. Odessa Union Warehouse Co-op.,* 833 F.2d at 176.

▪ Finally, just because a party has ceased the illegal course of conduct does not mean injunctive relief is unavailable. *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). The suit only becomes moot where "(1) there is no reasonable expectation that the wrong will be repeated, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Fed.Civ. Proc.,* § 13:84.7, *quoting Barnes v. Healy,* 980 F.2d 572, 580 (9th Cir.1992). "The burden of demonstrating mootness is a heavy one." *Barnes,* 980 F.2d at 580, *citing W.T. Grant,* 345 U.S. at 633, 73 S.Ct. at 897.

#### B

##### Relevant Factual Findings

After reviewing the documentary evidence and oral testimony herein and assessing the credibility of the witnesses, the Court makes the following findings of fact, as required by Fed.R.Civ.P. 52(a).

Defendant Jeffrey Lee White is the director of Operation Rescue of California. Defendants Joseph Foreman and Bryan Scott Kemper are members of Operation Rescue of California. Operation Rescue of California is an unincorporated association with headquarters in Lake Arrowhead. All three individual defendants have previously been convicted of resisting arrest in Stanislaus County, California. On or about August 30, 1989, defendants White and Foreman were found in contempt of court for violating a preliminary injunction issued on March 15,

1989 in *National Abortion Federation, et al. v. Operation Rescue, et al.,* CV 89–1181–AWT. And defendants White and Operation Rescue of California were permanently enjoined from, among other things, "[c]oming within 100 yards of any of the plaintiffs [four doctors, a clinic, and one of the doctor's wives], their families, their places of business, their business parking lots or their residences[.]" *Dym v. White, et al.,* Case No. 670970 (San Diego Super.Ct. March 24, 1995).

Since at least the Fall of 1994, members of Operation Rescue of California, led or directed by or acting together with the individual defendants, have gathered on most Friday mornings at approximately 7:00 a.m. at or near the junction of Dart Canyon Road and the private driveway of Dr. Michael Morris and his wife, Sarah Morris. The area is rural and mountainous. Dart Canyon Road is relatively untraveled; indeed, the paving ends approximately one-half mile west of the Morrises' home. Most of the road is narrow with little or no shoulder. It is the Morrises' only route to and from their home. Although there is a turnout approximately 1200 feet east of the Morris house, the demonstrators park on one or both sides of the narrow county road.

The purpose of the gatherings is to protest Dr. Morris' provision of reproductive health services, most notably, abortions. The participants manifest their purpose through comments, chants, shouts, gestures, and the display of placards bearing slogans such as "Abortion Kills Children" and "Abortion is murder."

Dr. Morris is aware of attacks on clinics where abortions are performed, as well as physical attacks on clinic workers, volunteers, and physicians. He has received flyers at his home, which he has also seen posted along the route he travels from his home in the mountains all the way into the city of San Bernardino, bearing his photograph, home address, and the caption **"WANTED (FOR THE MURDER OF UNBORN CHILDREN)."** As a result of the increased risks, his employer has hired guards for the clinics where Dr. Morris works, and the doctor wears a bullet-proof vest. Dr. Morris tries to keep track of the license numbers of the vehicles parked on Dart Canyon Road on Friday mornings should he need to make a police report. In addition, Mrs. Morris generally follows her husband in her own vehicle past the Operation Rescue demonstrators to ensure his safety.

On October 14, 1994, as Dr. Morris passed the Friday demonstration on his way to work, one of the protestors approached his vehicle and pantomimed shooting him. The demonstrators then got into a white Volkswagen van which is used regularly to transport the protestors to Dart Canyon Road on Friday mornings, and followed Dr. Morris closely as he descended the mountain, attempting to box him in along the way. Dr. Morris felt threatened, especially by the demonstrator who had pantomimed shooting him.

On Friday, December 9, 1994, Dr. Morris left for work at about 7:00 a.m.; Mrs. Morris followed in her vehicle. He approached the same intersection and saw between ten and twenty people actively demonstrating and protesting. The demonstrators lined both sides of the narrow county road. He stopped to check for on-coming traffic. As the Morrises entered the county road, demonstrators placed placards on Dr. Morris' front windshield and on Mrs. Morris' front windshield and side windows, blocking their full view of the road. Mrs. Morris stopped her vehicle; most of the demonstrators then surrounded her vehicle. Dr. Morris proceeded forward slowly.

Dr. Morris spotted a car parked on the county road among the protestors' caravan of vehicles, which he had not seen previously. He stopped his vehicle near it, got out, and approached. He moved a placard that was leaning in front of the red car's license plate to see the number, which he began to note on a small "post-it." As he was writing, the demonstrators ran from Mrs. Morris' vehicle, suddenly surrounding him. The demonstrators, including defendants Foreman, White, and Kemper, encircled him, yelling and jeering. Defendants White, Foreman, and Kemper also bumped, shoved and/or pushed Dr. Morris. The demonstrators and/or the de-

fendants blocked Dr. Morris and prevented his departure.

Mrs. Morris peered through the placards and saw the demonstrators surround her husband. She became very concerned for his safety and drove forward to where he had stopped his vehicle. She began to get out. One of the Morris' neighbors, who often sat at the intersection during demonstrations to monitor Dr. Morris' safety, witnessed the incident and similarly grew concerned for her neighbors' well-being. She proceeded in her vehicle from the private road where she had been parked toward the people surrounding Dr. Morris, honking her horn loudly to create a diversion. Dr. Morris escaped, returned to his vehicle, and left, as did Mrs. Morris. Dr. Morris sustained some cuts and scratches. The incident also caused both Dr. and Mrs. Morris to suffer mental anguish and stress.

Since December 9, 1994, a Deputy U.S. Marshal and/or an officer with the local sheriff's office have observed the demonstrations. On March 31, 1995, the movements of one of the demonstrators (not one of the individual defendants) caused Deputy Sheriff Dale Ryder concern with regard to Dr. Morris' safety. Deputy Ryder noticed that she had a large object in her pocket, partially concealed by a protest sign. He walked up behind her to try to ensure that she would not do anything to Dr. Morris.

Although the law enforcement presence promotes peaceful demonstrations, it drains their limited resources.

## C

### *Analysis*

Defendants argue that FACE violates the First Amendment and that neither the Commerce Clause nor Section 5 of the Fourteenth Amendment provided Congress with the necessary authority to enact the statute. Defendants also argue that FACE violates their rights to equal protection under the Fourteenth Amendment. Finally, defendants contend that plaintiff is not entitled to injunctive relief because they have not violated the law for several months.

### 1. *Commerce Clause*

■ Defendants argue that Congress lacked authority under the Commerce Clause to enact FACE, despite Congress' express findings that the clinic blockades and violence affect interstate commerce in myriad way. Defendants rely heavily on *United States v. Wilson*, 880 F.Supp. 621 (E.D.Wisc.1995), the only case in which a court has declared FACE to be unconstitutional. Defendants suggest, without really making the connection directly, that the recent Supreme Court decision in *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), supports the court's reasoning in *Wilson*. Essentially, defendants argue that Congress' findings are not rational because they would allow Congress to regulate just about any activity. As plaintiff observes, though, the district court effectively substituted its own findings for those of Congress.

"The task of a court that is asked to determine whether a particular exercise of congressional power is valid under the Commerce Clause is relatively narrow. The court must defer to a congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding." *Hodel v. Virginia Surface Mining and Reclamation Ass'n*, 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981), *citing Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 258, 85 S.Ct. 348, 358, 13 L.Ed.2d 258 (1964) and *Katzenbach v. McClung*, 379 U.S. 294, 303–04, 85 S.Ct. 377, 383, 13 L.Ed.2d 290 (1964). The only remaining question, Justice Marshall added, was "whether 'the means' chosen by [Congress] must be reasonably adapted to the end permitted by the Constitution." *Id.* (citations omitted). The Court in *Hodel* found that the district court had properly deferred to Congress' *express* findings on the effects of surface coal mining on interstate commerce. *Id.* Justice Souter explained in his dissent in *Lopez* that the Court's "practice of deferring ... reflects our respect for the institutional competence of the Congress on a subject expressly assigned to it by the Constitution and our appreciation of the legitimacy that comes from Congress's political

accountability in dealing with matters open to a wide range of possible choices." —— U.S. at ——, 115 S.Ct. at 1651–52 (citations omitted).

In *Lopez*, Chief Justice Rehnquist reviewed the "three broad categories of activity that Congress may regulate under its commerce power":

First, Congress may regulate the use of the channels of interstate commerce ... Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities ... Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, ... *i.e.,* those activities that substantially affect interstate commerce.

—— U.S. at —— – ——, 115 S.Ct. at 1629–30 (citations omitted). The Court clarified in *Lopez* that for purposes of the final category, "the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *Id.* at ——, 115 S.Ct. at 1630. Upon review of the Gun–Free School Zones Act of 1990, 18 U.S.C. § 922(q)(1)(A), the Court determined that in the absence of any congressional findings, the Government's proffered "substantial effects" on interstate commerce were too tenuous. Notably, the Government made a leap from a purely local offense (possession of a firearm in a school zone) to the effects of violent crime generally on people's willingness to travel and the learning environment, which *in turn,* would result in a less productive citizenry. In a 5–4 decision, the Court found that the number of inferences involved effectively "bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id.* at ——, 115 S.Ct. at 1634.

Unlike the Gun–Free School Zones Act of 1990, FACE was accompanied by specific congressional findings of the multiple ways in which clinic violence substantially affects interstate commerce. Congress found that the effects of well-documented and specifically-targeted violence had commercial ramifications involving the patients, providers, and clinic staff members. The campaign against abortion clinics, moreover, was (and is) *national,* frequently beyond the control of state and local authorities (assuming their willingness to respond in the first instance). The direct and substantial effects of clinic violence on interstate commerce, Congress found, made it a proper subject for federal legislation.

Other courts have deferred properly to Congress' findings in enacting FACE. For example, in *Council for Life Coalition v. Reno,* 856 F.Supp. 1422, 1431 (S.D.Cal.1994), Judge Gonzalez noted that "Congress collected ample evidence that the conduct prohibited under FACE affects interstate commerce" and further found "that the prohibitions in FACE are a reasonable and appropriate means to address the problem of violence at reproductive health service facilities." In *Riely v. Reno,* 860 F.Supp. 693, 707–08 (D.Ariz.1994), Judge Strand emphasized the fact that Congress had made findings and that there was "a rational basis for Congress' determination that the activity FACE regulates affects interstate commerce."

The Fourth Circuit, additionally, has already taken up the defendants' Commerce Clause argument in *American Life League, Inc. v. Reno,* 47 F.3d 642 (4th Cir.1995). The court noted the "extensive legislative record" from which Congress "rationally concluded" that the "violence, threats of force, and physical obstructions aimed at persons seeking or providing reproductive health services affect interstate commerce." 47 F.3d at 647. Specifically, Congress had found that "[m]any women travel across state lines to seek reproductive health care[,] ... Reproductive health facilities engage doctors and other staff in an interstate market ... These facilities buy medical and office supplies that move in interstate commerce ... [and] 'clinics have been closed because of blockades and sabotage and have been rendered unable to provide services.'" *Id.* (internal citations omitted).

The Fourth Circuit added that Congress "chose regulatory means reasonably adapted to permissible ends," specifically:

(1) protecting the free flow of goods and services in commerce, (2) protecting patients in their use of the lawful services of reproductive health facilities, (3) protecting women when they exercise their constitutional right to choose an abortion, (4) protecting the safety of reproductive health care providers, and (5) protecting reproductive health care facilities from physical destruction and damage.

*Id.* The court concluded: "Together, these findings, these means and these objectives are *more than ample* to justify Congress's invocation of the commerce power." *Id.* (emphasis added). *See also United States v. Dinwiddie*, 885 F.Supp. 1299, 1306–07 (W.D.Mo.1995) (court refused to reconsider constitutionality of permanent injunction on Commerce Clause grounds following *United States v. Wilson* because, among other things, "the Court remains persuaded by the commerce clause analysis articulated by the Fourth Circuit in *American Life League v. Reno*[.]"); *Cheffer v. Reno*, 1994 WL 644873, p. *1 (M.D.Fla.1994) ("Based on a review of the case file and relevant law, the court incorporates by reference the findings of the *American Life League* court and concludes that FACE is constitutional.")

Although it is not binding on this Court, the decision in *Wilson* invites comment. With all due respect, it does appear that the court substituted its own findings for those of Congress. Moreover, the court converted the rational basis test into one involving the strictest scrutiny, requiring in effect that each violation of FACE be shown to "substantially affect" interstate commerce. The court suggested that Congress could have regulated the clinics directly, but that the means embodied in FACE were too attenuated from interstate commerce to qualify as rational. 880 F.Supp. at 628. The court's conclusion that Congress' chosen method was "one step removed" and thus without precedential support ignored Congress' "institutional competence" in selecting appropriate means to address a problem it had found to be national in scope and effect. The court's own suggestions (requiring clinics to enhance security for example) seem inherently less rational than the means Congress selected, at least to the extent the court's alternative

would burden the victims with the cost. In any event, this Court agrees with the majority of courts that have applied the proper rational basis test to Congress' detailed findings and concludes that Congress possessed the necessary authority under the Commerce Clause to enact FACE.

### 2. *Fourteenth Amendment, Section 5*

Defendants have also argued that the other source of authority on which Congress based its enactment of FACE, the enforcement section of the Fourteenth Amendment, is inadequate. Although the Court need not reach this issue, it appears that Congress was not precluded from legislating in the area of clinic violence by section 5 of the Fourteenth Amendment, which grants Congress the power to enforce the Amendment "by appropriate legislation." Defendants argue that the section does not authorize Congress to regulate private, rather than state, conduct. Plaintiff contends that Congress has broad authority to enforce the Fourteenth Amendment and to the extent that FACE at least in part seeks to secure women's liberty interest by protecting their right to obtain an abortion, no court has held that Congress can*not* so legislate.

Professor Tribe, in his testimony on the constitutionality of FACE, acknowledged that "[b]y its terms ... the Fourteenth Amendment restricts only state action, not purely private conduct." Laurence H. Tribe, "The Constitutionality of the Freedom of Access to Clinic Entrances Act of 1993," 1 *Va.J.Soc.Policy & Law* 291, 295 (Spring 1994) ("Commentary"). He opined, though, that Congress could still "reach purely private blockades of abortion clinics and purely private assaults on persons seeking or providing abortion services." *Id.* Noting Congress' broad power to enforce the Fourteenth Amendment and "intimat[ions]" from the Supreme Court that Congress "could in fact regulate at least some private conduct" thereunder, Tribe concluded that section 5 would provide appropriate authority for Congress to enact FACE "once Congress concluded that states and municipalities, acting alone, will be unable to provide sufficient protection against private acts that threaten

the full enjoyment of federal constitutional rights[.]" *Id.* at 297–98.

Congress did find that "the interstate nature of this [interstate campaign of violent, threatening, obstructive and destructive conduct aimed at providers of reproductive health services] place it beyond the ability of any single state or local jurisdiction to control[.]" It would thus appear that the Fourteenth Amendment may well provide authority for Congress' enactment of FACE.

### 3. *First Amendment*

▄▄▄ Defendants' First Amendment concerns have now been thoroughly litigated in other courts. *No* court has validated their arguments in the slightest. Taken together, these cases make it clear that defendants may not invoke the First Amendment to immunize "intimidating," "injur[ious]," or "interfering" conduct because they happen to share a particular viewpoint about abortion. Congress was extremely cautious in balancing defendants' First Amendment rights with those of patients, clinic employees, physicians, and others to obtain or provide *legal* health services. Although defendants cry "foul," they have yet to cite either authority or examples to support their contention that FACE's regulation of unprotected *conduct* even implicates their rights of expression.

Defendants do not seriously challenge FACE as applied in this case. The U.S. has sought an injunction that would create a modest buffer zone around Dr. and Mrs. Morris personally, their vehicles, and at the key intersection of the private access and county roads. The Government has accounted for the nature of the terrain as well as the conduct that precipitated this action. In opposition, defendants state only that "[n]umerous courts have recognized, in precisely the context of pro-life activities, that picketing and other forms of communication are entitled to constitutional protection." Def. Opp.Mem., p. 32. They failed to explain how the injunction the Government seeks would in any way affect their ability to express their views. And, in fact, the injunction restricts only defendants' conduct; it does not regulate any aspect of defendants' speech, content or otherwise. As applied here, then,

there is no serious issue concerning FACE's constitutionality.

As for defendants' argument that FACE is content-based, they ignored completely the Fourth Circuit decision in *American Life League, Inc. v. Reno* and the district court opinions that have already rejected their position. In *American Life League,* plaintiffs filed an action the very day President Clinton signed the Access Act into law, challenging its constitutionality. The District court for the Eastern District of Virginia upheld the validity of FACE, and the Fourth Circuit affirmed.

The court explained that FACE "target[ed] unprotected activities." That is, "the Act ... prohibit[s] force, the threat of force and physical obstruction intended to deprive someone of the lawful right to use or provide reproductive health services." 47 F.3d at 648. The court added:

> The use of force is outside the scope of First Amendment protection ... True threats of force also lie outside the First Amendment.... Finally, certain physical obstructions, such as a blockade of pedestrian traffic, are not protected by the First Amendment.

*Id.* (citations omitted). This did not end the inquiry, and the court considered first whether FACE was "content and viewpoint neutral." *Id.*

The Fourth Circuit noted that if FACE outlawed conduct for its anti-abortion message, the court would apply the strict scrutiny standard, in which case "[t]o pass this test a law must be necessary to serve compelling governmental interests by the least restrictive means available." *Id.* Otherwise, intermediate scrutiny would require FACE to be "narrowly tailored to serve substantial governmental interests." *Id.* The court noted that the "neutrality inquiry" focused on whether the statute was justified without reference to the content of the violator's message or point of view, *not* on the violator's motive. *Id.* at 649. *Congress's* purpose is what matters.

The court reviewed Congress' statements that it only intended to prohibit conduct, then responded to plaintiffs' argument that the

statements were in fact subterfuge, as defendants contend here. *See* Def.Opp.Mem., pp. 15–20 ("By making abortion protest a federal crime, Congress displayed an unconstitutional bias against a particular protest movement.")[1] The court in *American Life League* rejected this argument, noting that FACE did *not* prohibit "peaceful protestors from praying, chanting, counseling, carrying signs, distributing handbills, or otherwise expressing their opposition to abortion. What the Act does prohibit is force, the threat of force, and physical obstruction." 47 F.3d at 650. The motive element "simply narrows [FACE's] reach, and this narrowing is within congressional prerogative." *Id.* The court cited both *Wisconsin v. Mitchell,* —— U.S. ——, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993) (upholding Wisconsin law enhancing sentence for aggravated battery because defendant intentionally selected victim because of race) and *R.A.V. v. City of St. Paul,* 505 U.S. 377, 390, 112 S.Ct. 2538, 2546–47, 120 L.Ed.2d 305 (1992) ("where government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy") in support of the well-established rule that enables Congress to "enact laws to punish proscribable conduct even though the conduct is motivated by certain biases or beliefs." *Id.* Nothing prevents Congress from narrowing laws to focus on particular problems: "Congress may choose to legislate only against actions it considers to be more serious." *Id.* at 651.

The Fourth Circuit then applied the intermediate level of scrutiny to determine FACE's validity, using the Supreme Court's test as set forth in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (upholding statute prohibiting burning of draft cards despite fact that most violators probably opposed the Vietnam War). Specifically, where an act incidentally affects speech as it regulates conduct, it may still pass constitutional muster "if it [1] furthers an important or substantial governmental interest; if [2] the governmental interest is unrelated to the suppression of free expression; and if [3] the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." 391 U.S. at 377, 88 S.Ct. at 1679.

The Fourth Circuit identified the substantial governmental interests as "protecting public health, safety and commerce, [notably] protecting patients and staff from violence and harm and protecting reproductive health facilities from physical destruction or damage [and] protecting interstate patient traffic and the interstate market for the services of doctors, nurses, counselors, and other staff." *Id.* The court also cited the interests related to "protecting women and men from violence and threats in the exercise of their rights," such as obtaining contraceptives and terminating pregnancies. *Id.*

The second *O'Brien* factor tracked the content- and viewpoint-neutrality test discussed above. The court had already found that FACE was justified independent of the message or viewpoint of a potential violator and was therefore not content-based. The third prong of *O'Brien,* requiring a "narrowly tailored" law, was also satisfied. To begin with, FACE outlawed conduct that contained "any protected expressive element at all." The court acknowledged that peaceful but ob-

---

1. The court in *Cook v. Reno,* 859 F.Supp. 1008 (W.D.La.1994), rejected the "subterfuge" argument out of hand: "We refuse to joust with plaintiffs as to the degree of exigency needed to justify protective legislation. Congress has seen fit, in the valid exercise of its Commerce Clause powers among others, to protect from harm or the threat of harm, persons or property used in obtaining or providing reproductive health services. We are presented with no evidence whatsoever indicating that the facts precipitating FACE were in error or confected ... One thing is certain, however: the statute is complete and regular on its face and leads to no absurd consequences." *Id.* at 1011. The court concluded:

We cannot fail to chronicle the fact that during the time between oral argument and the writing of this ruling, another disaster occurred at a reproductive health services establishment. The villainous attack left in its wake death, injury, and property damage. While we will not speculate whether others similarly inclined to do violence will be deterred by the enforcement of the law we parse today, we are certain that the Freedom of Access to Clinic Entrances Act is a valid exercise of legislative power designed to curb violence without stifling freedom of speech.

*Id.*

structive demonstrating might violate FACE, but determined that the Act nevertheless restricted "no more expressive conduct than necessary to protect safe and reliable access to reproductive health services." The Court added: "After all, the Act leaves open ample alternative means for communication." *Id.* at 652. Thus, FACE passed the *O'Brien* test.

Defendants also argue that FACE is overbroad and vague, ignoring consistent court decisions rejecting these contentions.

■ As the court explained in *Riely v. Reno, supra,* courts should consider a statute's claimed overbreadth before examining it for vagueness. 860 F.Supp. at 704, *citing Village of Hoffman Estates v. Flipside, Hoffman Estates Inc.,* 455 U.S. 489, 494–95, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982). Overbreadth must, moreover, be real and substantial in relation to its legitimate scope. *Id.* (citations omitted). The Fourth Circuit explained that striking down a substantially overbroad statute based on its proscription of so much protected speech is to be done "sparingly and only as a last resort." *American Life League,* 47 F.3d at 652–53, *quoting Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). The Fourth Circuit then acknowledged that peaceful picketing might be prohibited under the Act, but that this was only possible in "the most narrow and justifiable circumstances," that is, if demonstrators were also physically obstructing others' passage in and out of a facility. The court did not agree that such a restriction could constitute substantial overbreadth given FACE's legitimate scope of outlawing violence and access barriers. *Id.* at 653; *see also United States v. Brock,* 863 F.Supp. 851, 866 (E.D.Wis. 1994) ("to the extent that FACE reaches expressive activity, it is a permissible time, place, and manner regulation of the activity. As a result, FACE is not only not 'substantially' overbroad, it is not overbroad at all.").

Defendants also contend that FACE is vague, failing to give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited...." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972). The Fourth Circuit rejected this argument as well, based on the "clear, common words" Congress used in FACE and on the fact that the Act defined many of its terms. *American Life League,* 47 F.3d at 653; *see also Riely v. Reno,* 860 F.Supp. at 705; *Council for Life Coalition v. Reno,* 856 F.Supp. at 1429 ("not only does FACE include specific definitions ... [but] most of the operative words come from other statutes which the U.S. Supreme Court and other courts have construed and found not unconstitutionally vague."); *United States v. Brock,* 863 F.Supp. at 866 ("FACE gives 'fair notice to those to whom [it] is directed.' .. Moreover, many of its terms have already survived vagueness challenges in similar contexts.") (citations omitted).

As the developing case law regarding FACE makes clear, it is not content- or viewpoint based, nor is it vague or overbroad. Defendants make no effort to address these cases, let alone to distinguish them from this case. Wholly apart from this lack of candor in presenting the relevant authorities to the Court, the law is against defendants. As Professor Tribe explained, FACE "physically protect[s] those who seek to obtain or provide abortion services, is written in a manner that avoids any violation of the First Amendment's letter or spirit; it leaves antiabortion speech and peaceful protest untouched, and is carefully designed to avoid singling out for special penalties or restrictions acts that are identified in terms of the views that such acts express or the beliefs that such acts reflect." Commentary, 1 *VA.J.Soc. Policy & Law* at 307. Defendants' arguments to the contrary are unpersuasive and the Court hereby rejects them.

### 4. Equal Protection

■ Defendants argue that FACE violates the Equal Protection Clause by targeting only the anti-abortion viewpoint. They rely principally on two cases, both of which regulated peaceful picketing based on content without any narrow tailoring or grounding in a substantial state interest. *See Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) and *Police Department of City of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). In both

instances, the ordinance or statute restricted a constitutionally protected activity—peaceful picketing. To make matters worse, in both instances, a certain subject was exempted. The Supreme Court struck down both laws as violative of the First and Fourteenth Amendments.

Here, of course, FACE does not restrict picketing at all, nor does it make content distinctions. For the reasons discussed above, it plainly qualifies as content- or viewpoint-neutral, as several courts have found. Defendants' Equal Protection argument is unfounded.

### 5. *Mootness*

■ Finally, defendants argue in opposition to the preliminary injunction as well as in their 12(b)(6) motion that no violations of FACE have occurred since December 9, 1994, and the United States thus cannot prevail or even state a claim for injunctive relief. As the Government points out, defendants do not contest that, taking the complaint's allegations as true, plaintiff has shown violations of FACE. The mere fact that the weekly protests have been less disruptive since the *police* began monitoring the demonstrations does not obviate the need for an injunction. *See United States v. Odessa Union Warehouse Co-op., supra,* 833 F.2d at 176 ("cessation of violations does not itself foreclose issuance of an injunction. Courts must beware of attempts to forestall injunctions through remedial efforts and promises of reform that seem timed to anticipate legal action, especially when there is a likelihood of recurrence.")

Defendants have not represented that they intend to comply now (or ever) with FACE; indeed, they argue vigorously that it is invalid. They also do not state that they ever intend to stop demonstrating against Dr. Morris. In fact, the demonstrations have continued. Defendants do not state that continued law enforcement presence is unnecessary. As set forth above, defendants White and Operation Rescue are subject to a per-

manent injunction issued by the San Diego Superior Court on March 22, 1995 prohibiting them from, among other things, coming within 100 yards of other doctors and their families.[2]

Defendants' conduct elsewhere strongly suggests that they will not, in fact, comply with FACE's restrictions. On May 27, 1995, the individual defendants were all arrested by the Los Angeles Police Department in connection with their obstruction of a reproductive health services clinic. They have been convicted in Stanislaus County as recently as March 1995 for resisting arrest based on their refusal to follow a police officer's direct order. Defendants White and Foreman have even violated an injunction issued by Judge Tashima of this court in 1989. In short, not only did plaintiff state a claim for injunctive relief, it has established a substantial likelihood that it will prevail on the merits as well as a need for the particular relief requested.

To summarize, plaintiff has shown that there is a substantial likelihood that it will prevail in establishing each element of a FACE violation, that is, "1. Force, threat of force, or physical obstruction; 2. Done with the intent to; 3. Injure, intimidate, or interfere with a person, or attempt to do so; 4. Because that person has sought or provided, or is seeking or providing, or will seek to provide, reproductive health services." *United States v. Lindgren, supra,* 883 F.Supp. at 1324–25. In addition, defendants have not succeeded in their legal challenge or offered any evidence that would demonstrate that the balance of hardships tips in their favor. Rather, the Court finds and concludes that the relief requested and granted prohibits conduct only, not expression, imposing little or no hardship on defendants.

Moreover, the Court finds and concludes that the public interest in ensuring the basic safety and freedom of movement of the Morrises and preventing the recurrence of events such as those on December 9, 1994 tips the balance in plaintiff's favor. In light of the

---

**2.** For this reason, the Court finds defendants' counsel's suggestion at oral argument that the Operation Rescue members, including the individual defendants, had not selected the location or the target of their demonstrations based on Dr. Morris' provision of reproductive health services, that is, abortions, more than a little disingenuous.

Government's strong showing with respect to the merits of its claims, it need not make as substantial a showing regarding the relative hardships. Having fully met the standard for a preliminary injunction, the Government is entitled to this relief.

## V

### *THE PRELIMINARY INJUNCTION*

As set forth in open court on June 19, 1995 and by order entered the same date, defendants are restrained as follows:

1. Pending trial on the merits, Defendants JEFFREY WHITE, JOSEPH FOREMAN, BRYAN KEMPER (defendants) and their agents, servants, employees and all individuals acting in concert with them who receive notice of this Preliminary Injunction by personal service, receipt of this Preliminary Injunction or by being informed of the pertinent contents of this Preliminary Injunction or the "Notice" in paragraph 4, are hereby ENJOINED and restrained from committing any of the following acts or aiding, abetting, directing or inciting others from committing any of the following acts:

a. Using force or threats of force to interfere with or intimidate Dr. Michael Morris or his wife, Sarah Morris, in violation of the FACE statute;

b. Telephoning Dr. Michael Morris or Sarah Morris or entering their property on Dart Canyon Road;

c. Coming physically closer than 15 feet to Dr. Michael Morris' physical person or Sarah Morris' physical person, or coming closer than 15 feet to the edge of Dart Canyon Road as Dr. Morris or Sarah Morris passes in a vehicle;

d. Driving or placing a vehicle closer than 3 car lengths in front of or behind Dr. Michael Morris' vehicle or Sarah Morris' vehicle;

e. Placing placards or signs on or within 5 feet of Dr. Michael Morris' vehicle or Sarah Morris' vehicle;

f. Physically touching Dr. Michael Morris, Dr. Michael Morris' vehicle, Sarah Morris or Sarah Morris' vehicle; and

g. Demonstrating, congregating, or picketing within 45 feet in any direction from the seam of the intersection where Dart Canyon Road meets the Morris private driveway in Crestline, California.

2. Willful disobedience to this Preliminary Injunction or resistance to this Court's lawful order, rule, decree or command may subject any person subject to this Preliminary Injunction who commits such an act to criminal or civil prosecution for contempt of Court. *E.g.* 18 U.S.C. §§ 401, 402. Due to the remoteness of Dr. Morris' residence, the Court hereby empowers both the United States Marshals and the San Bernardino Sheriff's Department with the authority to enforce this Preliminary Injunction and arrest violators for willful violations of this Preliminary Injunction or take other appropriate action in order to ensure full compliance with this Preliminary Injunction.

3. The law enforcement officers empowered to enforce this Preliminary Injunction may also give persons subject to this Preliminary Injunction notice of its pertinent contents by informing them of the pertinent contents of the following Notice. If a person or his attorney has received notice of this Preliminary Injunction, this additional notice is not required.

4. The Notice is:

### *"NOTICE*

The United States District Court for the Central District of California in the case of *United States v. Jeffrey White and others,* CV–95–2760–RAP (GHKx) has ordered that Defendants JEFFREY WHITE, JOSEPH FOREMAN, BRYAN KEMPER (defendants) and their agents, servants, employees and *all individuals acting in concert with them* who receive actual notice of this Preliminary Injunction by personal service, actual receipt of this Preliminary Injunction or by being informed of the contents of this "Notice," are hereby immediately ENJOINED and restrained from committing any of the following acts or aiding, abetting, directing or inciting others from committing any of the following acts:

a. Using force or threats of force to interfere with or intimidate Dr. Michael Morris or his wife, Sarah Morris, in violation of the FACE statute;

b. Telephoning Dr. Michael Morris or Sarah Morris or entering their property on Dart Canyon Road;

c. Coming physically closer than 15 feet to Dr. Michael Morris' physical person or Sarah Morris' physical person, or coming closer than 15 feet to the edge of Dart Canyon Road as Dr. Morris or Sarah Morris passes in a vehicle;

d. Driving or placing a vehicle closer than 3 car lengths in front of or behind Dr. Michael Morris' vehicle or Sarah Morris' vehicle;

e. Placing placards or signs on or within 5 feet of Dr. Michael Morris' vehicle or Sarah Morris' vehicle;

f. Physically touching Dr. Michael Morris, Dr. Michael Morris' vehicle, Sarah Morris or Sarah Morris' vehicle; and

g. Demonstrating, congregating, or picketing within 45 feet in any direction from the seam of the intersection where Dart Canyon Road meets the Morris private driveway in Crestline, California.

YOU ARE HEREBY DIRECTED TO CONFORM YOUR CONDUCT TO THE REQUIREMENTS OF THIS PRELIMINARY INJUNCTION. IF YOU DO NOT, YOU MAY BE IMMEDIATELY ARRESTED. IF YOU DO NOT, YOU MAY ALSO HAVE TO PAY A CIVIL CONTEMPT FINE OF $1000 PER DAY UNTIL YOU COMPLY WITH THIS PRELIMINARY INJUNCTION. YOU ARE HEREBY ORDERED TO OBEY THIS PRELIMINARY INJUNCTION."

## VI

### *CONCLUSION*

For the reasons set forth above and stated orally on the record on June 19, 1995, the Court finds that plaintiff has demonstrated a substantial likelihood that it will prevail on the merits and that the balance of hardships tips in its favor. The above discussion constitutes the Court's Findings of Fact and Conclusions of Law under Fed.R.Civ.P. 52(a). The Court furthermore denies defendants' three motions to dismiss.

**IT IS SO ORDERED.**